SAXON MILLS *vs.* NEW YORK, NEW HAVEN, AND HARTFORD RAILROAD COMPANY.

SAME *vs.* PENNSYLVANIA RAILROAD COMPANY & another.

Suffolk.    March 4, 1913. — May 20, 1913.

Present: RUGG, C. J., MORTON, HAMMOND, & SHELDON, JJ.

*Carrier,* Of goods. *Conversion. Agency,* Existence of relation. *Contract,* What constitutes. *Evidence,* Admissions. *Practice, Civil,* Exceptions.

If a purchaser of goods directs the vendor to ship them to him by a certain route over several railroads and the vendor delivers them with explicit directions in writing as to that route to a railroad company which transports them on its lines and delivers them with the same directions to a second railroad company, and the second company receives the goods without issuing a bill of lading, such second company thereby assumes the obligations of a common carrier to transport the goods over its lines and to deliver them to the next carrier with and in accordance with the shipping directions given to it; and if, while the goods are in its possession, the second company alters the shipping directions so that the

goods continue over a different route leading to the same destination, such act is a wrongful exercise of dominion over the goods which is tantamount to a conversion of them, and the company is liable to the purchaser of the goods for their value if, while being so transported over the changed route, they are destroyed by an act of God.

Where a second carrier of goods without issuing a bill of lading has received goods for transportation from a first carrier with explicit directions in writing as to several successive carriers by whom they are to be handled, and alters the shipping directions and delivers the goods to the next carrier with the directions so altered, if the goods, while proceeding by the route specified by the second carrier, are destroyed by an act of God, such second carrier is liable to the owner of the goods for their value, although the route so designated by the second carrier, so far as could be seen in advance, involved no greater expense or delay and no greater risk of loss than did the route designated by the shipper. Nor can such second carrier's failure to issue a bill of lading as required by 34 U. S. Sts. at Large, c. 3591, § 7, avail as a defense to an action by the consignee 'of the goods to enforce such liability.

*Whether* a wrongful act of dominion by a second carrier, who received goods from a first carrier with explicit shipping directions in writing and altered the shipping directions so that the goods proceeded to the same destination by. a different route, was so far a technical conversion of the goods as to give the consignee a right to refuse the goods when they arrived at their destination in safety, here was not considered, because in this case the goods were destroyed by an act of God while passing over the altered route.

While several railroad corporations having connecting lines may make a contract forming themselves into an association called a "Despatch" for the carrying on of through transportation of goods over all of their lines at through rates, and may authorize an agent to act for the association in the issuing of bills of lading for such transportation, neither the existence of such a contract nor the authority of such an agent is lightly to be inferred.

If the authorized agent of an association called a "Despatch," formed by two connecting carriers for the procuring and carrying on of business in the through transportation of freight between points in New England and in the Southern States, issues a bill of lading for the transportation of certain goods from a point in New England to a point in the South after the goods, bearing specific directions in writing that they shall be shipped over the lines of the association, have left the point in New England, have passed through the hands of two carriers not members of the association and have come into the possession and control of one of the members of the association, and if thereafter, by reason of the fact that one of the preceding carriers which was not a member of the association had altered the shipping directions, the goods are diverted from the lines of the association and are destroyed by an act of God while so diverted, the carriers which are members of the association are jointly liable for the full value of the goods.

While ordinarily a carrier, who receives goods from another carrier to be transported further by still other carriers, is justified in acting upon the shipping directions or way bills which he receives with the goods from the preceding carrier, he is not so justified if an authorized agent of his, of whose acts he has or should have knowledge, by a contract with the owner or consignor of the goods has bound him to deal with the goods in a manner different from that shown in the shipping directions received from the preceding carrier.

By direction of the consignee of certain goods, they were to be shipped "via Pennsylvania Railroad c/o Eastern & Southern Despatch . . . and Southern Railway," and one declaring himself to be an agent of the "Eastern & Southern Despatch" issued a bill of lading to that effect. The goods were diverted after they left the Pennsylvania Railroad so that they proceeded by another route than the Southern Railroad, and, while so proceeding, were destroyed by an act of God. The consignee brought an action against both railroad corporations, "individually and also doing business under the name of the Eastern & Southern Despatch," at the trial of which it was agreed that all the facts in evidence were true. There was evidence that the defendants were an association acting under an agreement for the procuring of business for themselves, that the association had filed schedules with the interstate commerce commission for through rates between New England points and points in the Southern States, and that it issued bills of lading for and carried through such transportation. On the other hand there was evidence that the association existed practically for the sole purpose of soliciting business for the associated companies and that the agents had nothing to do with the transportation of freight or the collection of freight charges and exercised no control over such matters. It was not clear whether the goods had reached the Pennsylvania Railroad when the bill of lading was issued. The judge, subject to an exception by the defendants, directed a verdict for the plaintiff on such admitted facts. *Held*, that the exception should be sustained, because the question, whether the agent who issued the bill of lading had authority to bind the defendants, was for the jury, and, if the jury found that there was no such authority, they should find for the Southern Railroad Company, which never received the goods, and for the Pennsylvania Railroad Company if the bill of lading was issued when the goods were not in its possession, since in that case, not having made any inconsistent contract, it was justified in acting upon shipping directions which it had received from the preceding carrier.

CONTRACT OR TORT, against the New York, New Haven, and Hartford Railroad Company, for the value of certain looms purchased by the plaintiff of the Draper Company, "f. o. b. on the cars at Hopedale," delivered by the Draper Company under shipping directions of the plaintiff to the Grafton and Upton Railroad Company at Hopedale with orders to ship "via Pennsylvania Railroad c/o Eastern & Southern Despatch via Alexandria, Va. and Southern Railway," and delivered by the Grafton and Upton Railroad to the defendant as an intermediate carrier with the same orders, which an employee of the defendant altered so that the goods, after leaving the defendant, were directed to be shipped by the "Atlantic Coast Despatch" instead of by the "Eastern & Southern Despatch," and, while proceeding by the diverted route, were destroyed by fire and flood. Writ dated April 15, 1909. Also,

CONTRACT OR TORT, for the value of the same goods, by the same plaintiff against the Pennsylvania Railroad and the Southern Railroad, the writ as amended alleging that the action was brought against the defendants "individually and also doing business under the name of the Eastern & Southern Despatch." In this action the plaintiff relied on an agreement alleged to have been made by an agent of the Eastern and Southern Despatch that the goods should be shipped by its route. Writ dated April 15, 1909.

In the Superior Court the cases were tried together before *Wait*, J.

The Carmack amendment to the twentieth section of the interstate commerce act (34 U. S. Sts. at Large, c. 3591, § 7), referred to in the opinion, reads as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.

"That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

Of the interrogatories to Byrne, the superintendent of the defendant in the first action, and his answers thereto, referred to in the opinion, the seventh and ninth were as follows:

"Interrogatory 7: Did it [the defendant] receive from the Grafton and Upton Railroad Company or its officers or agents a voucher or freight receipt in connection with such cars?

"Answer: The agent of the defendant at Milford received a voucher from the Grafton & Upton Railroad Company in connection with the two cars of machinery."

"Interrogatory 9: Did the New York, New Haven, and Hartford Railroad Company, through its agents or employees at Milford, Massachusetts, receive any directions as to the route by which said cars were to be transported or conveyed to Spartanburg?

"Answer: No; no directions were received by the defendant company through its agents or employees at Milford as to the route by which said cars were to be transported or conveyed to Spartanburg. There was a notation at the top of the voucher referred to in Ans. to Int. 7, 'P. R. R. c/o Eastern & So. Desp. via Alex. Va. & So. Ry.' In the body of the voucher opposite the words 'For transportation to,' there was no writing, or directions of any kind."

The testimony as to the Holbrook letter was that on August 27, 1908, a clerk in the office of the Eastern and Southern Despatch in Boston wrote to F. S. Holbrook, general freight agent of the defendant, a letter reading as follows: "Enclosed is a shipping receipt issued to Draper Company at Hopedale, Mass. Aug. 18th covering two carloads of machinery, via. N. H. 79954 and P. C. C. 534546, cotton mill machinery for Saxon Mills, Spartanburg, S. C. You will notice this receipt is very plainly marked with rubber stamp 'Via Penn. R. R. C/o Eastern & Southern Despatch via Alexandria, Va. and Southern Ry.' Your office at Milford inform me that the cars came to them routed as indicated by the rubber stamp. These cars are only two of a lot of several cars which your Milford office has been billing over our Eastern & Southern Despatch to Spartanburg. For some reason unknown to me a Mr. J. T. O'Niel, whom it seems is billing freight at Milford for your Company, took it upon himself to favor the Atlantic Coast Despatch with these two carloads. This I am quite sure is contrary to anything that the N Y N H & H R R Management will stand for in the face of specific instructions as to routing by the shippers. Further, Southern Ry delivery was desired by the Saxon Mills and they requested Draper Company to ship over Eastern & Southern Despatch which Draper Company you see did. Will you not kindly pursue this matter with the Agent at Milford in such way that diversions of this character

will not occur in the future? Please return the enclosed shipping receipt to me with your reply, and oblige."

This letter was admitted in evidence, subject to the exception of the defendant New York, New Haven, and Hartford Railroad, the judge stating that it was not admitted as proof of what took place at Milford. The clerk testified that the shipping receipt referred to in that letter was the shipping receipt received from the Draper Company for which he issued the Eastern and Southern Despatch bill of lading.

A reply to the letter was received in due course at the office of the Eastern and Southern Despatch, which read as follows:

"New York, New Haven, and Hartford Railroad Company
Office of the                    Boston, Mass. September 4th, 1908.
General Freight Agent
Mr. John S. Dennee, Agent,
    Eastern & Southern Despatch,
        Boston, Mass.

"Dear Sir:—Returning shipping receipt dated Hopedale the 18th ult., covering shipment machinery for Spartanburg, S. C. and replying to yours of the 27th, . . . would say that through negligence of a temporary clerk these cars were billed against your line. Agent Mullane regrets the error very much and assures me that at the first opportunity he will not fail to make good on some unrouted business. I will send you copies of the billing to cover.

Yours truly,
F. S. Holbrook
General Freight Agent.
W."

The evidence as to the time of the issuing of the bill of lading by the agent of the "Eastern & Southern Despatch," and the time when the goods were received by the Pennsylvania Railroad Company, which times were spoken of in the opinion as not "absolutely fixed," was as follows: A shipping clerk of the Draper Company testified that in the ordinary course of business the cars containing the freight would have left Milford by the New York, New Haven, and Hartford Railroad at about 1.30 oclock P.M. on August 18, and should have been at Harlem River some time the next forenoon; that the freight receipt or bill of lading from the Grafton and

Upton Railroad Company was mailed to the Eastern and Southern Despatch at Boston in the afternoon of August 18 and reached Boston on August 19; and that the Eastern and Southern Despatch bill of lading was mailed on August 19, and was received at Hopedale on the morning of August 20. A clerk in the Boston office of the Eastern and Southern Despatch testified that in the ordinary course the bill of lading would be mailed by him "sometime on" August 19, and that the freight would have reached the Pennsylvania Railroad in the middle of the day or early afternoon of that day.

The other material facts are stated in the opinion.

At the close of the evidence, it having been agreed by the parties in each action that all the facts in evidence were true and that the plaintiff's damages in each action, if it was entitled to recover therein, were $5,600, the judge ordered a verdict for the plaintiff in each action in that sum; and the defendants severally alleged exceptions.

*J. L. Hall,* (*S. C. Rand* with him,) for the New York, New Haven, and Hartford Railroad Company.

*R. G. Dodge,* for the Southern Railway Company.

*B. N. Johnson,* for the Pennsylvania Railroad Company.

*F. T. Hammond,* (*W. Williams* with him,) for the plaintiff.

SHELDON, J. In the first one of these two cases, which were tried together in the Superior Court and have been argued together before us, it appeared that the defendant company received the two cars containing these goods at its Milford station from the Grafton and Upton Railroad Company. The defendant had then no contract with the plaintiff or with the Draper Company, the consignor; it had not issued, and apparently never undertook to issue, any bill of lading for them; nor did it enter or attempt to enter into any express or written contract for their transportation. But it received the cars without objection and undertook to transport them over its own lines and to deliver them to the next carrier on their way to their final destination. This created a contractual relation between the defendant and the owner of the goods, and bound the defendant to the ordinary duties of a common carrier. With the cars the defendant received, also without objection, plain and unmistakable directions that the cars were to go to their final destination at Spartanburg, South Carolina, by

way of the Eastern and Southern Despatch, through Alexandria, Virginia, and over the road of the Southern Railway Company. The "Eastern & Southern Despatch" is the designation of an established route, operating from points in New England over the Pennsylvania railroad and its connections to Alexandria and thence over the Southern Railway to Spartanburg and other points in the South. The defendant had however no interest in this Despatch. The defendant received from the Grafton and Upton Railroad Company the freight charges for these goods for the whole distance to Spartanburg, and was itself to settle those charges with the various companies over whose lines the goods were to go.

As the defendant received these goods with explicit directions as to their transportation and forwarding, it assumed the obligation of transporting them and delivering them to the next carrier with and in accordance with these directions. *Wright & Colton Wire Cloth Co.* v. *Warren,* 177 Mass. 283. *Dana* v. *New York Central & Hudson River Railroad,* 50 How. Pr. 428. *Railroad* v. *Cabinet Co.* 104 Tenn. 568. Instead of performing this duty, it took upon itself to alter these shipping directions, and directed the goods to be sent by the "Atlantic Coast Despatch," another route, which after reaching Alexandria varied from the route which the plaintiff had selected, by going over other railroads to the same final destination. The result of this conduct of the defendant was that these cars, after having been properly carried to Alexandria, were there delivered to the railroad whose lines with others formed the Atlantic Coast Despatch, and while going over those lines were destroyed by a flood and fire, for the effect of which a common carrier would not ordinarily be responsible.

The defendant was under the contractual duty to transport these goods to its connection with the Pennsylvania Railroad and there to deliver them with the shipping directions to that company. It received full pay for this service; it received also full payment for the transportation beyond its own line, and undertook to pay the other carriers therefor. It is idle to say that it had entered into no contract with the plaintiff or the plaintiff's agent the consignor of the goods. The issue of a bill of lading or the execution of any other formal contract was not necessary. *Finn* v. *Western Railroad,* 112 Mass. 524, 532. Whether there was any contract between the plaintiff and the companies forming the

Eastern and Southern Despatch, did not concern the defendant. It need not have received the goods and the charges for freight and have undertaken the duty of transportation according to the shipping directions, without first obtaining whatever information it needed and issuing a bill of lading; but it chose to do so, and must be held to discharge the obligation which it thus assumed.

Under these circumstances its act in changing the route to be taken by the goods and directing that the changed route be followed was wholly wrongful. *S. D. Seavey Co.* v. *Union Transit Co.* 106 Wis. 394. *Cincinnati, New Orleans & Texas Pacific Railroad* v. *Steele,* 140 Ky. 383. It undertook, apparently without reason, to deal with the goods as if they had been its own, to say that they should not go over the route and by way of the railroads selected by the shipper, but by a different route and over the lines of other companies. It makes no difference that the change involved no greater expense or delay, and no greater risk of loss so far as could be seen in advance. This conduct of the defendant was tantamount to a conversion. *Briggs* v. *Boston & Lowell Railroad,* 6 Allen, 246. *McKahan* v. *American Express Co.* 209 Mass. 270. *Forsythe* v. *Walker,* 9 Penn. St. 148. *Hutchings* v. *Ladd,* 16 Mich. 493, 501. It was not a mere failure to forward shipping directions, which simply would have made the defendant liable for the proximate results of its negligence, as in *North* v. *Merchants & Miners' Transportation Co.* 146 Mass. 315; *Little Miami Railroad* v. *Washburn,* 22 Ohio St. 324; and *Booth* v. *Missouri, Kansas & Texas Pacific Railway,* 37 S. W. Rep. 168. It was not mere nonfeasance or delay, or even a bare intermeddling with the goods, not involving a change in the disposition to be made of them. It was the exercise of dominion over the goods, the substitution of the defendant's will for that of the owner as to what should be done with them. It caused, apparently it was intended to cause, a delivery of the goods to one whom neither the owner nor the consignor had authorized to receive them. This of itself would have been a conversion. *Claflin* v. *Boston & Lowell Railroad,* 7 Allen, 341. *Hall* v. *Boston & Worcester Railroad,* 14 Allen, 439, 443. *Libby* v. *Ingalls,* 124 Mass. 503. *Forbes* v. *Boston & Lowell Railroad,* 133 Mass. 154. *Merrick* v. *Webster,* 3 Mich. 268. *Michigan Southern & Northern Indiana Railroad* v. *Day,* 20 Ill. 375. *Georgia Railroad* v. *Cole,* 68 Ga. 623, 627. *Davis* v. *Garrett,* 6 Bing.

716, 723, 724. *Joseph Thorley* v. *Orchis Steamship Co.* [1907] 1 K. B. 660. It may be that the act done was not so far a technical conversion that if the goods had reached Spartanburg in safety, the plaintiff would not have been obliged to receive them and thus to relieve the defendant from liability. See 2 Wyman on Public Service Corporations, § 908, and cases there cited. But this need not be considered. The liability of the defendant on the case presented is the same in either event. The defendant's wrongful act has been followed by the loss of the goods without their having been ever restored to the control of the owner.

The defendant's contractual responsibility was not merely to the connecting railroad company from which it received the goods; it was rather to their consignee or owner. It would not have been necessary to speak of such a contention if it had not been asserted in argument. Nor can the defendant's failure to issue a bill of lading as required by the Carmack amendment to the Interstate Commerce Act (34 U. S. Sts. at Large, c. 3591, § 7) avail it as a defense. Unless it knew of and relied upon the bill of lading to be issued by the Eastern and Southern Despatch, this was its own failure of duty, for which neither the plaintiff nor the consignor can be held responsible. Its liability is for its own wrongful act, which made it responsible for the preservation and safe delivery of the goods, and we need not consider whether it is responsible as for a conversion or rather as an insurer of the goods. *McKahan* v. *American Express Co.* 209 Mass. 270, 276. *Johnson* v. *New York Central Railroad,* 33 N. Y. 610. *Goodrich* v. *Thompson,* 44 N. Y. 324. *Maghee* v. *Camden & Amboy Railroad Transportation Co.* 45 N. Y. 514. *Isaacson* v. *New York Central & Hudson River Railroad,* 94 N. Y. 278. *Wilts* v. *Morrell,* 66 Barb. 511. *Philadelphia & Reading Railroad* v. *Beck,* 125 Penn. St. 620. *Railroad* v. *Odil,* 96 Tenn. 61. *Booth* v. *Missouri, Kansas & Texas Pacific Railway,* 37 S. W. Rep. 168.

We see no question upon the conceded facts that could have been submitted to the jury. The testimony of Byrne the defendant's vice-president, in answering the ninth interrogatory of the plaintiff, that the defendant received no directions at Milford as to the route by which the cars were to be sent to Spartanburg, was controlled by the rest of his answers, and was manifestly incorrect. Indeed this was hardly contested at the argument before us.

That the railroad companies making up the Eastern and Southern Despatch may also be liable to the plaintiff under the contract contained in the bill of lading is of course no defense to this action. The plaintiff may pursue all its remedies until it has obtained satisfaction for its loss.

We cannot see that the defendant was prejudiced by the admission in evidence of the letter signed "F. S. Holbrook, General Freight Agent. W." even if it was not strictly competent, which we do not decide.  See *Green* v. *Boston & Lowell Railroad,* 128 Mass. 221; *Boston & Maine Railroad* v. *Ordway,* 140 Mass. 510, 512; *Lane* v. *Boston & Albany Railroad,* 112 Mass. 455; *Gott* v. *Dinsmore,* 111 Mass. 45.  It was not admitted as evidence of what took place at Milford, which doubtless would have been erroneous.

Upon the admitted facts, the verdict for the plaintiff was rightly ordered; and the entry must be

*Exceptions overruled.*

In the second of these cases the plaintiff seeks to hold the Pennsylvania Railroad Company and the Southern Railway Company responsible for the loss of the same goods.  The plaintiff, at the request of the agent of the Eastern and Southern Despatch, had arranged to have shipments made to it by that line.  After these goods had been delivered by the Draper Company, the plaintiff's vendor, to the Grafton and Upton Railroad at Hopedale, the Draper Company took from that railroad company a shipping receipt for the two cars in which the goods were loaded, stamped with a routing stamp furnished to the Draper Company by the Eastern and Southern Despatch, which stated that the goods were to go *via* the Pennsylvania Railroad in care of that Despatch, *via* Alexandria, Virginia, and the Southern Railway.  This receipt, so stamped, the Draper Company sent on the same day to the office of the Despatch in Boston, which on the second morning thereafter returned the bill of lading of the Despatch, which was in evidence.  This bill of lading acknowledged the receipt at Hopedale of the goods in the two specified cars for transportation to the plaintiff at Spartanburg, South Carolina, at a stated rate of freight.  The bill of lading was signed by Dennee as agent, with the statement that his signature acknowledged only the receipt of the property and the advance charges, if any.  By the mis-

feasance of the New York, New Haven, and Hartford Railroad Company, as has been stated in the preceding opinion, the shipping directions on these cars were altered at Milford, so as to order them sent by the Atlantic Coast Despatch, another route or line running from Alexandria (Potomac Yard) to Spartanburg over other roads. The cars were transported by the New York, New Haven, and Hartford Railroad Company to the end of its route and delivered to the Pennsylvania Railroad; they were then taken over the line of that road and its connections to the Potomac Yard at Alexandria. There by the authority of the Pennsylvania Railroad Company, following the directions that had been given by the New York, New Haven, and Hartford Railroad Company, these cars were delivered to the railroad companies whose lines formed the Atlantic Coast Despatch; and while being transported over those roads they were practically destroyed, as has been stated, by causes for which a common carrier would not be held responsible. The plaintiff claims to hold the defendants on the ground that they were the Eastern and Southern Despatch, and by the bill of lading which has been mentioned agreed to transport the goods over their lines; that they failed to do so but sent them from Alexandria by other roads, and thus made themselves responsible for the safety of the goods for the same reasons that have been stated in the preceding opinion.

The Eastern and Southern Despatch was not only the name of a through freight line running over the tracks of the defendants; it was, according to much of the evidence, an association formed by the defendants to procure business for their roads. It filed schedules of its freight rates with the Interstate Commerce Commission, including the rates to be charged between many places in the Southern States and many cities and towns in New England; Hopedale among others. It was accustomed to issue through bills of lading for goods which it received for transportation between all these places. It was the successor of a former association called the Richmond and Danville Despatch, which had been created for the purpose of establishing a joint through freight line between points in the north, including New England, and the Southern States. According to some of the evidence it had been accustomed to receive shipments of freight from Hopedale to points in the South, to issue for such shipments through bills of lading, and to

transport them over the defendants' roads as soon as it received them from the New York, New Haven, and Hartford Railroad, as it did receive them in this case. It was agreed at the trial that all the facts which had been put in evidence were true; and if there were no other evidence than what has been stated, we should not doubt that the defendants were jointly interested in the Eastern and Southern Despatch, and were bound by the bill of lading issued by its authorized agent. We agree that the defendants had the power to bind themselves by such a contract, even though they thereby made themselves responsible for the bringing of goods to their roads by other carriers, so long as they did not transcend the limits of what is reasonably incident to the prosecution of their business as carriers. This was the doctrine of *Swift* v. *Pacific Mail Steamship Co.* 106 N. Y. 206; *Pennsylvania Railroad* v. *Jones,* 155 U. S. 333; *Hill Manuf. Co.* v. *Boston & Lowell Railroad,* 104 Mass. 122; *Block* v. *Fitchburg Railroad,* 139 Mass. 308; *Fitchburg & Worcester Railroad* v. *Hanna,* 6 Gray, 539; *Champion* v. *Bostwick,* 18 Wend. 175. Neither the authority of an agent to make such a contract nor the actual making thereof by a railroad company is lightly to be inferred; but it has been held that both must be made out by clear and convincing evidence. The decisions relied on by the defendants establish no more than this. *Nutting* v. *Connecticut River Railroad,* 1 Gray, 502. *Darling* v. *Boston & Worcester Railroad,* 11 Allen, 295. *Gass* v. *New York, Providence & Boston Railroad,* 99 Mass. 220. *Burroughs* v. *Norwich & Worcester Railroad,* 100 Mass. 26. *Pendergast* v. *Adams Express Co.* 101 Mass. 120. *Washburn & Moen Manuf. Co.* v. *Providence & Worcester Railroad,* 113 Mass. 490. *Hartan* v. *Eastern Railroad,* 114 Mass. 44. *Aigen* v. *Boston & Maine Railroad,* 132 Mass. 423. *Taylor* v. *Maine Central Railroad,* 87 Maine, 299. *Illinois Central Railroad* v. *Foulks,* 191 Ill. 57. *Insurance Co.* v. *Railroad Co.* 104 U. S. 146. *Myrick* v. *Michigan Central Railroad,* 107 U. S. 102. The constitutionality of the Carmack amendment to the Interstate Commerce Act, already referred to, otherwise would have been more open to doubt. *Atlantic Coast Line Railroad* v. *Riverside Mills,* 219 U. S. 186. *Galveston, Harrisburg & San Antonio Railway* v. *Wallace,* 223 U. S. 481.

But there was other evidence the truth of which was equally agreed to. There was testimony that the original agreement for

the formation of the Richmond and Danville Despatch had on various occasions been modified, sometimes by express and sometimes by tacit agreements, so that gradually it had lost all its characteristics except its purpose of providing a means for the solicitation of freight to go over the roads of the parties thereto, for the quoting of rates, and for the issue of bills of lading in exchange for those issued by the carriers performing the initial transportation of the shipments. There was evidence also that each of the companies whose connecting lines made up the line known as the Eastern and Southern Despatch participated in the freight charges for such transportation according to the actual movement over their respective roads of each particular shipment, the division being the same whether a shipment was made under an Eastern and Southern Despatch bill of lading or under one issued by the initial carrier solely in its own name. Other testimony was that the name Eastern and Southern Despatch was used by the defendants only as the name of a system of offices maintained in Boston and other eastern cities to solicit south bound shipments of freight; that the agents in charge of these offices (including of course Dennee, who signed and issued the bill of lading relied on by the plaintiff) never had anything to do with the transportation of freight or the collection of freight charges, or exercised any control over such transportation or charges. Upon this and other evidence set forth in the exceptions, we are of opinion that it was a question of fact for the jury whether Dennee had authority from both of the defendants to issue the bill of lading in question, and thereby to bind the defendants jointly for the transportation of these goods by the designated route from Hopedale to Spartanburg. This would be determined by drawing reasonable inferences from the facts which were testified to and which were admitted to be true. If Dennee had such authority, then upon the conceded facts the verdict for the plaintiff was rightly ordered against both defendants.

If such a contract was made, there was plainly a breach of it by the Pennsylvania Railroad Company, in diverting the cars from the agreed route and sending them over the Atlantic Coast Despatch, and for this breach of their joint contract both the defendants would be liable. The wrongdoing of the New York, New Haven, and Hartford Railroad Company in altering the ship-

ping directions so that as received by the Pennsylvania Railroad Company they called for delivery to the Atlantic Coast Despatch, furnished no excuse. It is true ordinarily that a second or later carrier who receives from an earlier carrier goods for further transportation is justified in acting upon the shipping directions or way bills which he receives with the goods from the preceding carrier; for the consignor or owner of the goods is presumed to have made the preceding carrier his agent to deliver both the goods and the shipping directions to each succeeding carrier. *Briggs* v. *Boston & Lowell Railroad,* 6 Allen, 246. *Vaughan* v. *Providence & Worcester Railroad,* 13 R. I. 578. *Little Miami Railroad* v. *Washburn,* 22 Ohio St. 324, 333. *Illinois Central Railroad* v. *Foulks,* 191 Ill. 57. *Railroad* v. *Cabinet Co.* 104 Tenn. 568. But this doctrine cannot be applied to a case where the later carrier has bound himself by his own contract with the owner or consignor to deal with the goods in a different manner from that directed by the preceding carrier. Having made this special contract by its authorized agent, the Pennsylvania Railroad Company could not justify its breach thereof by setting up shipping directions of a preceding carrier, which it knew or ought to have known to be at variance with the obligations which it had assumed by its own agreement. This is true upon principle and authority. *Waltham Manuf. Co* v. *New York & Texas Steamship Co.* 204 Mass. 253, 256. *Richer* v. *Fargo,* 77 App. Div. (N. Y.) 550. *Isaacson* v. *New York Central & Hudson River Railroad,* 94 N. Y. 278. The misdelivery made or procured by the Pennsylvania Railroad Company to the Atlantic Coast Despatch was a departure from its contract, which constituted an abandonment thereof, and in the event which has happened made both defendants liable either as insurers or for a conversion. See the cases cited *ante,* 391, 392.

If however Dennee had not authority to make such a joint contract in behalf of both the defendants, or an agreement whereby they accepted the goods at Hopedale and agreed to carry them from that place to Spartanburg, different questions arise. In that event the bill of lading is to be treated as the separate agreement of each defendant for transportation over its own road, and would not take effect as a binding contract of either defendant until the goods had been received by it. *Sears* v. *Wingate,* 3 Allen, 103. *Fearn, Putnam & Co.* v. *Richardson,* 12 La. Ann. 752.

*Hunt & Macauley* v. *Mississippi Railroad,* 29 La. Ann. 446. *Missouri Pacific Railway* v. *McFadden,* 154 U. S. 155, 161. *Cunard Steamship Co.* v. *Kelley,* 53 C. C. A. 310; 115 Fed. Rep. 678. But these goods never came into the possession of the Southern Railway Company. They were diverted from it without its fault. It follows, upon the finding supposed, that the Southern Railway Company would have been entitled to a verdict in its favor.

The goods were received by the Pennsylvania Railroad Company. It does not appear however to have been absolutely fixed by the evidence whether the bill of lading was or was not issued while the goods were in its possession or under its control. If the former was the case, and if Dennee had not authority from this defendant to make the joint contract, it follows from what we have said that the liability of this defendant was established. If the latter was the case, then this defendant, not having bound itself by any inconsistent contract, was justified in acting upon the shipping directions which it received from the preceding carrier, and so it also would have been entitled to a verdict in its favor.

Of course, the plaintiff, while it may recover judgment in both of those actions, can have but one satisfaction. It has not been contended otherwise.

The result is that in the second action the exceptions of each defendant must be sustained; and it is

*So ordered.*